JD:DJL
F.# 2018R00520

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAME "MELO FLOXKS" THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | TO BE FILED UNDER SEAL<br><br>APPLICATION FOR A SEARCH WARRANT FOR INFORMATION IN POSSESSION OF A PROVIDER (FACEBOOK ACCOUNT)<br><br>Case No. 18-M-511 |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, ANDREW O'CONNELL, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant for information associated with Facebook username "Melo Floxks" that is stored at premises owned, maintained, controlled or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the username "Melo Floxks".

2.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives Joint Robbery Task Force (the "Task Force"). My training and experience has

included investigating crimes facilitated by the use of electronic communication devices, including smart phones and social media, such as Facebook.

3. The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 924(c) and 1951(a) have been committed. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. The United States is investigating armed robberies of a pharmacy located at 8823 Avenue L, Brooklyn New York on March 2, 2018 (the "Pharmacy Robbery") and a gas station located at 8930 Avenue D, Brooklyn, New York on March 5, 2018 (the "Gas Station Robbery"). The investigation concerns possible violations of, inter alia, Title 18, United States Code, Sections 924(c) and 1951.

6. On or about March 5, 2018, two male perpetrators approached a gas station located at 8930 Avenue D, Brooklyn, New York, while one of the employees of the gas station ("Employee-1") was pumping gas into the vehicle of an off-duty NYPD officer (the "Officer"). Another employee of the gas station ("Employee-2") was in the "island" booth at the gas station.

7. One of the perpetrators ("Robber-1") approached Employee-1 and stated, in sum and substance and in part, "don't fucking move."

8. The other perpetrator, later identified as William Simon, approached Employee-2, held a firearm by the side of his leg, and demanded, in sum and substance and in part, that Employee-2 give him money. Employee-2 responded, in sum and substance and in part, that he did not have money. Simon patted down Employee-2, then attempted to strike Employee-2 with his hand.

9. At or around the time that Simon was attempting to strike Employee-2, Robber-1 told Simon, in sum and substance and in part, that it was time to "bounce."

10. During the attempted robbery, the Officer fired his weapon at the perpetrators, striking William Simon. Robber-1 fled the scene.

11. Simon was pronounced dead shortly thereafter. A silver firearm was recovered from the ground underneath Simon's legs, as well as a black iPhone 7+ from Simon's personal effects and clothing brought with Simon to the hospital.

12. In the course of the investigation of the Gas Station Robbery, law enforcement learned of the Pharmacy Robbery which law enforcement has reason to believe was committed by the same two individuals. Law enforcement reviewed surveillance video of the Pharmacy Robbery which revealed that one of the individuals brandished a large silver revolver. Officers recovered a large silver revolver – a Ruger .44 caliber revolver – from under the body of William Simon following the Gas Station Robbery.

13. In the course of their investigation, law enforcement officers have learned that William Simon's Facebook username is "Melo Floxks." Law enforcement officers learned

this by reviewing and monitoring the Facebook activity of "Melo Floxks" and Facebook posts tagging "Melo Floxks" following Simon's death. Prior to his death, Simon posted photos and statements to Facebook regarding his gang affiliations and prior criminal activity. Specifically, Simon posted photos to Facebook in which he displayed the gang sign for the 59 Brims, a set of the national Bloods gang.

14. Based on my training and experience, I have learned that targets of investigations such as this often communicate via Facebook rather than using their mobile phones because they believe that law enforcement will search their phones and/or obtain records of their mobile phone calls.

15. An individual close to Simon, whose identity is known to law enforcement, stated that Simon told him/her that Simon preferred to communicate with others via Facebook Messenger rather than by phone because he believed that law enforcement monitored mobile phones.

16. Law enforcement officers have learned that William Simon posted numerous times for individuals who are also believed to be affiliated with the 59 Brims to "DM," or "direct message" him, via Facebook rather than contact Simon by phone.

17. Additionally, following William Simon's death, a subject of law enforcement's investigation – and one of the individuals that law enforcement has reason to believe Simon direct messaged with on Facebook – posted a photo of William Simon with commentary on April 1, 2018. The commentary highlighted the criminal activity the two engaged in. In the photo, Simon is displaying a hand gesture to signify his gang affiliation. The post stated the following:

> "This my boy Billy Day fucc everything else[.] R.I.P. my top flrrrrttt[.] . . . . They seen how we was Roccing, went from crunching opps on this day to making alla lat flrrrttt shit really living the Hyena lifestyle[.]  A lot of niggas can't hang but you did, kept ya word HH till ya death date[.] 2x never switched . . . . #yougoingbyebye[.] We made that on a scary night clocc work, aint' gonna talk much but niggas betta #flrrrttt back for my right hand."

18. Based on my training and experience, the "Hyena lifestyle" is a reference to Simon's involvement in criminal activities and gang affiliation with the 59 Brims.

19. Based on my training and experience, as well as the ongoing investigation, law enforcement officers have reason to believe that the reference to "[a] lot of niggas can't hang but you did, kepta ya word HH till ya death date" and "[w]e made that on a scary night clocc work, aint' gonna talk much," is a reference to the Gas Station robbery.

## **TECHNICAL INFORMATION ABOUT FACEBOOK**

20. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites and other personal identifiers. Facebook also assigns a user identification number to each account.

22. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

23. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In

addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

27. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

7

28. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

29. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

32. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

33. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

36. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

37. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crimes at issue. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's

state of mind as it relates to the offenses at issue. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

40. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

41. Based on the foregoing, I request that the Court issue the proposed search warrant.

42. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

44. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation, and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

45. Pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding Facebook not to notify any person (including the subscribers or customers of the account listed in the attached warrant) of the existence of the attached warrant until further order of the Court.

Respectfully submitted,

Andrew J. O'Connell
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Subscribed and sworn to before me on June 7, 2018

_____
HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A
**Property To Be Searched**

This warrant applies to information associated with the Facebook "Melo Floxks" that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**
**Particular Things To Be Seized**

I. **Information To Be Disclosed By Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the username listed in Attachment A from January 1, 2018 to the present:

    (a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    (b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    (c)    All photos and videos uploaded by that username and all photos and videos uploaded by any user that have that user tagged in them;

    (d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

                    gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)      All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)      All "check ins" and other location information;

(g)      All IP logs, including all records of the IP addresses that logged into the account;

(h)      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)      All information about the Facebook pages that the account is or was a "fan" of;

(j)      All past and present lists of friends created by the account;

(k)      All records of Facebook searches performed by the account;

(l)      All information about the user's access and use of Facebook Marketplace;

(m)      The types of service utilized by the user;

(n)      The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

II.    **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code, Sections 924 and 1951 involving William Simon and others known and unknown since January 1, 2018, including, for the username identified in Attachment A, information pertaining to the following matters:

    (a) Communications regarding the planning and/or execution of the Pharmacy Robbery;

    (b) Communications regarding the planning and/or execution of the Gas Station Robbery;

    (c) Communications regarding the planning of any violations of Title 18, United States Code, Sections 924 and/or 1951;

    (d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

    (e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

    (f) The identity of the person(s) who created or used the username, including records that help reveal the whereabouts of such person(s); and

    (g) The identity of any person(s) who communicated with the username about the Pharmacy Robbery, Gas Station Robbery and/or the death of William Simon, including records that help reveal their whereabouts.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is _____. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

    c.    such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date    Signature

JD:DJL
F.# 2018R00520

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: WARRANT TO FACEBOOK INC. | TO BE FILED UNDER SEAL<br><br>No. 18-M-511 |

**ORDER**

The United States has submitted an application pursuant to 18 U.S.C. § 2705(b), requesting that the Court issue an Order commanding Facebook Inc., an electronic communication service provider and/or a remote computing service, not to notify any person (including the subscribers and customers of the account listed in the warrant) of the existence of the attached warrant for the period of one year from the date of this Order.

The Court determines that there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, or intimidate potential witnesses. *See* 18 U.S.C. § 2705(b).

IT IS THEREFORE ORDERED under 18 U.S.C. § 2705(b) that Facebook Inc. shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person for the period of one year from the date of this Order, except that Facebook Inc. may disclose the attached warrant to an attorney for Facebook Inc. for the purpose of receiving legal advice.

2

IT IS FURTHER ORDERED that the application and this Order are sealed until otherwise ordered by the Court.

Dated: Brooklyn, New York
      June 7, 2018

_____
HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK